IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MERCEDES BASILIO, ON BEHALF OF | : | CIVIL ACTION |
| HERSELF AND HER MINOR CHILDREN | : | NO. 10-cv-1281 |
| B.M. AND M.M., AND DOLORES | : | |
| ADELAIDA BASILIO PERALTA, | : | |
| | : | |
| v. | : | |
| | : | |
| CITY OF PHILADELPHIA, et al. | : | |

O'NEILL, J. September 10, 2013

## MEMORANDUM

Now before me is defendant City of Philadelphia's motion for summary judgment, Dkt. No. 39, and the response thereto of Dolores Adelaida Basilio Peralta and Mercedes Basilio, on behalf of herself and her minor children B.M. and M.M. Dkt. No. 44.[1] For the following reasons I will grant the motion.

## BACKGROUND

A lengthy recitation of the facts giving rise to this lawsuit can be found in my opinion regarding the motion for summary judgment brought by the individual officer defendants in this case. See also Dkt. No. 38, Dkt. No. 43. Only one count in plaintiffs' amended complaint is directed against the City: Count III, in which Mercedes Basilio asserts a claim for damages from the City pursuant to Monell v. New York City Department of Social Services, 436 U.S. 658 (1978). Dkt. No. 9, Am. Compl. ¶¶ 93-96. Specifically, the amended complaint alleges that it is the pattern and practice of the City, through its police officers, "to execute search warrants in an unreasonable manner, which includes destroying personal property, ruining personal belongings,

---

[1] Only plaintiff Mercedes Basilio asserts a claim against the City of Philadelphia in Count III of plaintiffs' amended complaint. Am. Compl. ¶¶ 93-96. Nonetheless, the response to the City's motion for summary judgment was filed on behalf of all plaintiffs. See Dkt. No. 44.

and disrupting the homes and businesses of citizens in violation of the Fourth and Fourteenth Amendments of the United States Constitution." Am. Compl. ¶ 94. Plaintiffs claim that the City "routinely executes search warrants in an unreasonable manner that causes unnecessary destruction of property." Id. at ¶ 95; see also ¶ 73. They assert that as a direct and proximate result of this policy, the individual defendants executed the search of Basilio's home in an allegedly unreasonable and violent manner, used excessive force and caused unnecessary damage to Basilio's property. Id. at ¶ 74.

The City moves for summary judgment on this claim and argues that plaintiffs have not produced any evidence to show that the City has an unconstitutional policy regarding the execution of search warrants by its police officers. Dkt. No. 39 ECF p. 8. Additionally, it contends that plaintiffs have not "produce[d] any evidence to show that the City has failed to train its officers properly in the execution of search warrants, or that the City permits officers to violate citizens' Constitutionally-protected rights in any manner." Id. Further, according to the City, plaintiffs have not "produce[d] any evidence whatsoever to show that the underlying incident was a result of any policy, practice, or custom" condoning the manner of the warrant execution in this case. Id.

Plaintiffs counter that the City and the officers involved in the search of Mercedes Basilio's premises had been sued multiple times for the officers' conduct in seeking and executing search warrants, false arrests, police brutality and other misconduct. Dkt. No. 44 at ECF p. 2; see also Dkt. No. 44-6. Moreover, plaintiffs argue that the City has been the subject of multiple investigations regarding police misconduct in obtaining and executing warrants for narcotics searches, which, plaintiffs contend, suggests that the City had notice for a number of years that the Police Department was "rife" with examples of misconduct. Dkt. No. 44 at ECF p.

2-3.  In support of this contention plaintiffs submit a large sample of newspaper articles that suggest that some of the individual defendant officers were investigated beginning in late 2008 and early 2009 for misconduct in the use of CIs, the execution of warrants, and in narcotics investigations.  Dkt. Nos. 44-3, 44-4, 44-5.[2]  Plaintiffs note that some of the defendant officers have also been reassigned to desk duty, Dkt. No. 44-4 at ECF p. 2, 11; Dkt. No 45 at ECF p. 5, and that many other narcotics officers have been subjected to the same disciplinary action; the district attorney also has stated that he will no longer be calling the officers as witnesses in narcotics prosecutions.  Dkt. No. 45 at ECF p. 5-9.

     Plaintiffs further assert that the record is replete with evidence from which a jury could conclude that the City did in fact "consciously turn a blind eye to the misconduct of its police." Dkt. No. 44 at ECF p. 3.  In support of this contention plaintiffs cite to the history of the Philadelphia Police Department and its use of confidential informants.  Plaintiffs submit that in 1996, following a mid-1990's scandal in the 39th District in which it emerged that police "routinely fabricated the information allegedly provided by CIs regarding illegal drug activities as the basis for establishing probable cause to obtain search warrants," id., and after a number of lawsuits resulting in those officers' criminal convictions and civil liability for civil rights violations, id.; Dkt. No. 44-1 at ECF p. 10, the City entered into a consent decree in which it pledged to undertake various reforms to improve oversight of narcotics officers in general and the Department's use of CIs in particular.  Dkt. No. 44 at ECF p. 3.  These reforms included

---

[2] It is unclear when the federal and local probes into these officers began but the exhibits submitted by plaintiffs include reporting that suggests that a probe into defendant Cudjik began in February 2009.  See Dkt. No. 44-5 at ECF p. 20 (noting that the District Attorney had continued any case in which defendant Cujdik or others involved in the probe might have to testify).  The documents in plaintiffs' exhibits, when dated, suggest that press coverage of the investigation into various narcotics officers began in March and April 2009.  See generally Dkt. Nos. 44-3, 44-4, 44-5.

3

greater supervision of narcotics officers' search and seizure activities, periodic audits and interviews with narcotics officers to determine adherence to rules regarding probable cause affidavits, the use of force and compulsion during searches, and the treatment of individuals in places searched for narcotics.  Dkt. No. 44-1 at ECF p. 2-4.  In support of their contentions, plaintiffs also point to deposition testimony from William Blackburn, who became Chief Inspector of Narcotics in 2002, in which Blackburn suggests that the reforms imposed by the consent decree were not effective or even fully implemented, and that after he undertook his own review of the Department's policies regarding CI use, his own policy recommendations for improving accountability in CI use and oversight also largely went unimplemented.  Dkt. No. 44-2 at ECF p. 30-38.

Another effect of the consent decree was to establish an Integrity and Accountability Office in the Police Department.  Dkt. No. 44 at ECF p. 5.  The IAO then undertook a review of the Department's enforcement of narcotics laws; this effort produced the Green-Ceisler report in 2002.  Id.; see also Dkt. No. 44-3 at ECF p. 30-37.  The report emphasized that "it is absolutely essential that there are stringent regulations guiding the use of CIs and that they are rigorously enforced."  Id. at ECF p. 31 (emphasis in original).  The Green-Ceisler report found that existing safeguards against corruption and the procedures to ensure the integrity of the use of CIs were insufficient.  Id. at ECF p. 31-33.  It further stated that "[i]t is incontrovertible that officers do violate civil rights in the enforcement of narcotics laws. . . .  Evidence of such misconduct is found in the [internal affairs] investigations and civil rights lawsuits where allegations of excessive force [sic], and illegal detentions, searches and arrests are documented and proven."  Id. at ECF p. 35.  While the report noted that "[o]verall, the arrests reports [sic] and search and seizure warrants contained in these files presented sufficient legal basis for the police actions," it

4

went on to describe several factors that might encourage or contribute to police officers "cutting constitutional corners." Id. at ECF p. 35-36. Most importantly, the report noted that the "Department's failure to consistently and effectively address identified violations of policies designed to safeguard citizens' civil rights sends the message that such misconduct is not regarded as serious and may in fact be tolerable." Id. at ECF p. 37.

The IAO, however, was defunded in 2006. Dkt. No. 44-3 at ECF p. 47. No further reviews or audits with respect to narcotics enforcement were conducted between 2005 and 2009. Dkt. No. 44-2 at ECF p. 42 (Blackburn Dep. 59:3-21). Then, in March 2009, following the probe of the narcotics officers as described above, the City undertook another effort to revise its protocols regarding the use and oversight of CIs. Dkt. No. 44 at ECF p. 7-8. The effort was conducted by the Integrity Control Officer, a new position created in March 2009 which was specifically tasked with protecting "against corrupt, illegal or other improper actions by CIs and their control officers." Dkt. No. 44-1 at ECF p. 7, 36 (deposition of Alice Mulvey, the Integrity Control Officer at the time).

**STANDARD OF REVIEW**

Summary judgment will be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The party moving for summary judgment bears the burden of demonstrating that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Celotex, 477 U.S. at 322-23. If the movant sustains its burden, the nonmovant must set forth facts demonstrating the existence of a genuine dispute. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). A dispute as to a material fact is

genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.  A fact is "material" if it might affect the outcome of the case under governing law. Id.

> To establish "that a fact cannot be or is genuinely disputed," a party must:
>
> > (A) cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> >
> > (B) show[ ] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).  The adverse party must raise "more than a mere scintilla of evidence in its favor" in order to overcome a summary judgment motion and cannot survive by relying on unsupported assertions, conclusory allegations, or mere suspicions. Williams v. Borough of W. Chester, 891 F.2d 458, 460 (3d Cir. 1989).  The "existence of disputed issues of material fact should be ascertained by resolving all inferences, doubts and issues of credibility against" the movant. Ely v. Hall's Motor Transit Co., 590 F.2d 62, 66 (3d Cir. 1978) (citations and quotation marks omitted).  Additionally, a Court should not make credibility determinations or weigh the evidence at summary judgment. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000).  Rather, "[w]henever a factual issue arises which cannot be resolved without a credibility determination, at this stage the Court must credit the non-moving party's evidence over that presented by the moving party." 1352 Lofts Prop. Corp. v. Bobby Chez of PA, LLC, 855 F. Supp. 2d 367, 375 (E.D. Pa. 2012), citing Anderson, 477 U.S. at 255.

## DISCUSSION

The City seeks summary judgment on Count III of plaintiffs' amended complaint, in

which Mercedes Basilio asserts a claim pursuant 42 U.S.C. § 1983, alleging that the City has maintained a pattern and practice of allowing its police officers to conduct unreasonable search warrants in violation of her rights under the Fourth and Fourteenth Amendments to the U.S. Constitution.  Dkt. No. 9. ¶¶ 93-96.  A municipality or other local government may be liable under section 1983 if the governmental body itself "subjects" a person to a deprivation of rights or "causes" a person "to be subjected" to such deprivation.  See Monell v. New York City Dept. of Social Servs., 436 U.S. 658, 692 (1978).  But, under section 1983, local governments are responsible only for "their *own* illegal acts;" they are not vicariously liable under section 1983 for their employees' actions.  Connick v. Thompson, 131 S. Ct. 1350, 1359 (2011) (citations omitted).  Plaintiffs who seek to impose liability on local governments under section 1983 must prove that "action pursuant to official municipal policy" caused their injury.  Monell, 436 U.S. at 691.  Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law.  Connick, 131 S. Ct. at 1359 (citations omitted).  These are "action[s] for which the municipality is actually responsible."  Id. (citations omitted).

"In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of [section] 1983."  Id.  A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train.  Id. (citation omitted).  To satisfy the statute, a municipality's failure to train its employees in a relevant respect must amount to "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact."  Id., citing City of Canton, Ohio v. Harris, 489 U.S. 378, 388 (1988).  Only then "can such a shortcoming be properly thought of as a city 'policy or

7

custom' that is actionable under [section] 1983." Connick, 131 S. Ct. at 1359-60, quoting City of Canton, 489 U.S.at 389.

"'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." Connick, 131 S. Ct. at 1360, quoting Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown, 520 U.S. 397, 410 (1997). Thus, when city policymakers have actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program. Connick, 131 S. Ct. at 1360. The city's "policy of inaction" in light of notice that its program will cause constitutional violations "is the functional equivalent of a decision by the city itself to violate the Constitution." Id. (citations omitted). Thus, a pattern of similar constitutional violations by untrained employees is "ordinarily necessary" to demonstrate deliberate indifference for purposes of failure to train. Id. (citations omitted). Policymakers' "continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the 'deliberate indifference'—necessary to trigger municipal liability." Id. (citations omitted). "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." Id. Similarly, a municipality may be liable under Monell for its failure to supervise its employees only if it reflects a policy of deliberate indifference to constitutional rights. Jewell v. Ridley Twp., 497 F. App'x 182, 186 (3d Cir. 2012) (citation omitted).

I find that plaintiffs have not produced evidence creating an issue of material fact on

Mercedes Basilio's <u>Monell</u> claim against the City.  The record does not contain sufficient material for me to conclude that the City had notice that, due to a lack of training or supervision, its narcotics officers generally served warrants in an unreasonable manner (including with the unnecessary destruction of personal property).  Similarly, the record does not contain sufficient evidence for me to conclude that the City had notice that the individual officer defendants named in this action engaged in a pattern of unreasonable warrant execution and lacked training or supervision regarding proper warrant execution.  Indeed, the bulk of the materials that plaintiffs argue demonstrate issues of material fact on this claim are specific to the City's alleged failure to sufficiently monitor and review the use of CIs by its police officers.  <u>See e.g.</u>, Dkt. No. 44-2 at ECF p. 41 (Blackburn Dep. 57:8-12, noting that Blackburn's recommended changes to the CI oversight protocols came prior to the accusations against the individual defendants); <u>id.</u> at ECF p. 54 (Blackburn Dep. 94:7-15, noting efforts to prevent possible police misconduct or corruption pre-date the investigation into the officer defendants in this case).  In other words, much of the evidence submitted by plaintiffs to demonstrate an issue of material fact on this claim is specific to alleged pre-warrant police misconduct, while Mercedes Basilio's claim itself is based entirely on alleged police misconduct after their acquisition of a warrant, namely in the alleged pattern of unreasonable and unnecessary destruction of property during the execution of a warrant.  Thus the evidence regarding pre-warrant police behavior is inapposite to Basilio's claim alleging post-warrant police misconduct.

While the 2002 Green-Ceisler Report does note that the "Department's failure to consistently and effectively address identified violations of policies designed to safeguard citizens' civil rights sends the message that such misconduct is not regarded as serious and may in fact be tolerable," Dkt. No. 44-3 at ECF p. 37, this alone is insufficient to impose liability on

9

the City for a failure to train and/or supervise its narcotics officers on the proper manner of executing search warrants. The report also makes no specific reference to any history or pattern of City police officers unnecessarily damaging or destroying personal property. The record makes clear that there are potential issues of fact concerning the supervision and use of CIs in narcotics investigations as these relate to civil rights violations. However, those issues, while significant, bear little relationship to whether the City exhibited deliberate indifference in its failure to provide training and/or oversight regarding the manner in which warrants were executed or whether the City was deliberately indifferent to unnecessary damage and destruction of a resident's property during the execution of a search warrant.[3] Plaintiffs have had the opportunity to elaborate on Mercedes Basilio's claim through discovery, having taken depositions of at least two senior Philadelphia police officials in charge of narcotics oversight and all of the ten individual officer defendants. I find no evidence suggesting the City should have had notice about any history or pattern of these individual officers, or the narcotics officers in general, executing search warrants in the manner unreasonable manner alleged in this case. Therefore, summary judgment for the City is appropriate on this claim.

      An appropriate Order follows.

---

[3] Further, in my companion opinion regarding the motion for summary judgment brought by the individual officer defendants in this case, I found appropriate the issuance of the warrant at issue in this action based on information provided by a confidential informant.